UNITED STATES of America,
Plaintiff,

v.

Jeronimo TORRES–DEL MURO, Defendant.

No. 98–30096.

United States District Court,
C.D. Illinois,
Springfield Division.

July 20, 1999.

Patricia A. Tomaw, Springfield, IL, for plaintiff.

Thomas W. Patton, Springfield, IL, for defendant.

*OPINION*

MILLS, District Judge.

Is the exclusionary rule available as a remedy for a violation of the consular notification provision of the Vienna Convention?

No.

Motion to suppress denied.

## I. Background

During early November of 1998, Illinois State Police stopped a 1994 Ford Aerostar van near Lincoln, Illinois. The van was driven by Defendant Jeronimo Torres–Del Muro ("Muro"), and the passengers included six other Mexican nationals. Suspecting that the occupants of the van might be illegal aliens, the Illinois State Police Officer contacted the Springfield, Illinois office of the Immigration and Naturalization Services ("INS").

INS officers determined that Muro and several other occupants were in the United States illegally and, thus, transported the occupants to their Springfield office for interrogation. Subsequently, INS Officer Tom Merchant advised Muro of his *Miranda* rights. Officer Merchant did not, however, notify Muro that he had a right to consult with Mexican consular officials in accordance with INS regulations [1] and Article 36 of the Vienna Convention, 21 U.S.T. at 100–101, 596 U.N.T.S. at 292 ("Convention"). Shortly after the *Mi-*

---

**1.** *See* 8 C.F.R. § 242.2(e) (1979). Defendant does not use the violation of the regulations as a basis to suppress.

*randa* warnings, Muro waived his *Miranda* rights and made inculpatory statements to the INS officers.

A federal grand jury indicted Muro on December 3, 1998. Muro now seeks to suppress his statements based on INS's failure to notify him of his right to consult with the Mexican Consulate. To support his motion, he has attached an affidavit from Fernando Gonzalez, the Mexican consul in St. Louis. Consul Gonzalez swore that if he had been notified of Muro's arrest, he would have advised Muro not to make any statements to the INS, and would have explained Muro's rights under the Fifth Amendment. In addition, Muro signed an affidavit stating that if he had been notified of his right to consult with a consulate, he "would have exercised that right and requested that I.N.S. allow [him] to talk to [his] consul. [He] would have told the I.N.S. agents that [he] did not want to speak to them until after [he] had spoken to a Mexican consul." Moreover, Muro swore that he would have followed the consulate's advice, which *in effect* would have resulted in Muro not waiving his Fifth Amendment rights.

Now, the Court turns to address the merits of Muro's motion to suppress.

## II. Analysis

Article 36 of the Vienna Convention on Consular Relations, April 24, 1963, art 36, 21 U.S.T. 77,596 U.N.T.S. 261 provides:

1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State: (a) consular officers shall be free to communicate with the nationals of the sending State and to have access to them. Nationals of the sending State shall have the same freedom with respect to communication with and access to consular officers of the sending State;

   (b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. *The said authorities shall inform the person concerned without delay of his right under this subparagraph;*

   (c) consular officials shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation.

Vienna Convention, art 36, 21 U.S.T. at 100–101. (emphasis added).

The Vienna Convention was approved by the Senate on October 22, 1969, formally ratified by President Nixon on November 12, 1969, and entered into force for the United States on December 24, 1969. *See* William J. Aceves, *The Vienna Convention on Consular Relations: A Study of Rights, Wrongs, and Remedies,* 31 VAND.J. TRANSNAT'L L. 257, 268–269 (1998). Having been so ratified, it became "law of the Land" under the Supremacy Clause of the Constitution. U.S. CONST. art. VI, cl. 2.

As an initial matter, the Court notes, and the parties agree, that the treaty is "self-executing" in the sense that there is no need for enabling legislation for the Convention to have the force of law.[2] Moreover, it is undisputed that INS officials did not notify Defendant that he had a right to speak with his consulate. Thus, the ultimate question becomes whether that failure can be a basis for invoking the exclusionary rule.

---

2. There are two distinct meanings of the phrase "self-executing" in international law. One meaning denotes a treaty that does not need implementing legislation. Another meaning refers to a treaty that creates private rights of action. *See Committee of U.S. Citizens Living in Nicaragua v. Reagan,* 859 F.2d 929, 937 (D.C.Cir.1988).

The Government makes two arguments in opposition to the suppression motion: first, that Defendant lacks "standing" to seek redress for a violation of the Vienna Convention because the Article does not create private enforceable rights. Second, even if he did have standing, the Defendant failed to show prejudice from the INS's failure to advise him of his treaty rights.

## A.

The Government argues that the Vienna Convention only creates rights enforceable by the "State," and hence, Defendant lacks standing. *See e.g., In re Money Cases,* 112 U.S. 580, 598, 5 S.Ct. 247, 28 L.Ed. 798 (1884); *Charlton v. Kelly,* 229 U.S. 447, 33 S.Ct. 945, 57 L.Ed. 1274 (1913). However, it acknowledges that a private action can arise under a treaty when the treaty expressly or by implication provides for a private right of action. *See Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 442, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989); *Columbia Marine Services, Inc. v. Reffet Ltd.,* 861 F.2d 18, 21 (2d Cir.1988). This Court has already addressed the issue of whether a foreign national has a right to consular notification. *See United States v. Chaparro–Alcantara,* 37 F.Supp.2d 1122, 1125 (C.D.Ill.1999) (Scott, J.). Shortly after that decision, the Ninth Circuit also held that foreign nationals have notification rights under Article 36(b)(1). *See United States v. Lombera–Camorlinga,* 170 F.3d 1241, 1243 (9th Cir.1999); *see also, Breard v. Greene,* 523 U.S. 371, 118 S.Ct. 1352, 1355, 140 L.Ed.2d 529 (1998) (per curiam) (stating that the Convention "arguably confers on an individual the right to consular assistance following arrest.") The Court agrees with these cases and holds that Defendant had a private right to consular notification under the Vienna Convention. Accordingly, the Court holds that Defendant has standing to seek a remedy based on the violation of his consulate notification rights.

## B.

It is well established that the exclusionary rule is applied generally to deter the police from violating a person's *constitutional* rights. *See, e.g., Elkins v. United States,* 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960) ("[the exclusionary rule's] purpose is to deter—to compel respect for constitutional guaranty in the only effectively available way—by removing the incentive to disregard it"); *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *United States v. Harrington,* 681 F.2d 612, 615 (9th Cir. 1982) ("There must be an exceptional reason, typically the protection of a constitutional right, to invoke the exclusionary rule"); *United States v. $69,530.00 in United States Currency,* 22 F.Supp.2d 593, 595 (W.D.Tex.1998) (citing *Arizona v. Evans,* 514 U.S. 1, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995)). In addition, unless a statute provides otherwise, the exclusionary rule is generally not available as a remedy for a violation of a statute. *See United States v. Thompson,* 936 F.2d 1249, 1251–52 (11th Cir.1991) (court may not suppress testimony for statutory violation unless Congress explicitly or implicitly provided exclusion as a remedy for a violation); *United States v. Hensel,* 699 F.2d 18, 29 (1st Cir.1983) (exclusionary rule fashioned to vindicate "specific, constitutionally protected rights"); *see also United States v. Kington,* 801 F.2d 733, 737 (5th Cir.1986).

The Court finds no reason to depart from these principles when deciding whether the exclusionary rule is an available remedy for violating an international treaty. Thus, in order for Defendant to invoke the judicially created exclusionary rule in this case, the Vienna Convention must explicitly provide for that remedy, or the violation of the treaty must rise to a level of a constitutional violation.

The Court finds nothing in the text of the Vienna Convention nor its history which manifests the signatory nations' intent to remedy violations of the treaty

specifically through the exclusionary rule. *See also Chaparro–Alcantara*, 37 F.Supp.2d at 1125–26; *United States v. Enger*, 472 F.Supp. 490, 545 (D.N.J.1978) ("No exclusionary rule is explicated by ... the Vienna Convention....") In addition, the Court finds that the failure to notify the foreign national of his right to speak with his consul, *per se*, does not implicate constitutional rights. *See, e.g., Chaparro–Alcantara*, 37 F.Supp.2d at 1125 ("It is clear that Article 36 does not create a 'fundamental' right such as Sixth Amendment right to counsel, or the Fifth Amendment right against self-incrimination which originates from concepts of due process."); *Waldron v. I.N.S.*, 17 F.3d 511, 518 (2nd Cir.1993) ("Although compliance with our treaty obligations clearly is required, we decline to equate such a provision with fundamental rights ..."); *United States v. Esparza–Ponce*, 7 F.Supp.2d 1084, 1097 (S.D.Cal.1998) (refusing to equate a violation of Article 36 to a *Miranda* violation).

Significantly, Defendant does not argue that this case involved a constitutional violation, nor that the violation rose to a level of a constitutional violation. Defendant instead argues that under international law, the customary remedy for violations of treaties is to restore the *status quo ante*. *See* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 901 cmt. d. (1987) ("[o]rdinarily, emphasis is on forms of redress [for violations of treaties] that will undo the effect of the violation, such as restoration of the status quo ante, restitution, or specific performance of an undertaking.") He further argues that returning to the *"status quo ante"* would require restoring Defendant to his position before his confession. The only way to achieve the *"status quo ante,"* he argues, would be to suppress the statements made by the Defendant. The Court finds this argument to be unpersuasive for several reasons.

First, it is questionable whether international law should govern this case. The convention itself states that "the rights referred to in paragraph 1 of this article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the provisio, however, that the said laws and regulations must not nullify these rights." Vienna Convention, art. 32(2). A plain reading of this provision suggests that international law would not apply. Second, even if the Court assumes that international law applies, Defendant's argument fails because suppression is not the *only* remedy available or permitted to be used to return Defendant to his *"status quo ante."* Defendant might theoretically be able to seek monetary damages for the violation of his notification rights through a *Bivens* action.[3] Since suppressing relevant evidence is an extreme measure,[4] and since Defendant could theoretically be placed back to *"status quo ante"* through a damages action, the Court rejects Defendant's argument.

Since Defendant does not argue a constitutional violation, nor that the violation of the Vienna Convention treaty rose to a level of a constitutional violation, the Court finds that the exclusionary rule is an unavailable remedy in this case. *Accord, United States v. Tapia–Mendoza*, 41 F.Supp.2d 1250, 1254 (D.Utah 1999) ("This court ... rules that the remedy of suppression is not available under the Vienna Convention"); *$69,530.00 in United States Currency*, 22 F.Supp.2d at 595.

---

**3.** The Court does not hold as a matter of law that the violation of the Vienna Convention is *de facto* actionable under *Bivens*. The Court uses the *Bivens* action merely as an example of an alternate remedial scheme.

**4.** The Supreme Court has acknowledged the "substantial" cost of exclusion which "hamper[s]" the enforcement of valid laws and keeps "concededly relevant and reliable evidence" from the jury. *United States v. Janis*, 428 U.S. 433, 447, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976); *see also United States v. Payner*, 447 U.S. 727, 734, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980) ("[U]nbending application of the exclusionary sanction ... would impede unacceptably the truth-finding....")

*Ergo,* Defendant's Motion to Suppress (d/e 6) is DENIED.